Anne Chapman (#025969)
anne@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone:  (602) 388-1232

Louis S. Fidel (#025479)
PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701-1782
Telephone:  (520) 622-6900
Email: lfidel@pd-law.com

Christopher B. Dupont (#014158)
TRAUTMAN DUPONT, PLC
PO Box 431
Phoenix, Arizona 85001
Telephone: (602) 770-8942
dupontlaw333@gmail.net

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br>1.      Natalie Renee Hoffman<br>             (Counts 1-3)<br>2.      Oona Meagan Holcomb,<br>             (Counts 2-3)<br>3.      Madeline Abbe Huse,<br>             (Counts 2-3)<br>4.      Zaachila I. Orozco-McCormick<br>             (Counts  2-3)<br><br>                    Defendants. | No. 17-00339MJ-TUC-BGM<br><br>**MOTION TO DISMISS CHARGES PURSUANT TO THE RELIGOUS FREEDOM RESTORATION ACT**<br><br>**Evidentiary Hearing Requested** |

Pursuant to the Religious Freedom Restoration Act of 1993 ("RFRA") and Federal Rule of Criminal Procedure 12(b)(1), Defendant Natalie Hoffman by and through undersigned counsel hereby requests that the Court dismiss Count 1 of the Information against her, alleging that she Operated a Motor Vehicle in a Wilderness Area. Also, pursuant to RFRA and Federal Rule of Criminal Procedure 12(b)(1), all Defendants request that the Court dismiss Count 2 of the Information against them, alleging that they Entered a National Wildlife Refuge Without a Permit. Also, pursuant to RFRA and Federal Rule of Criminal Procedure 12(b)(1), all Defendants request that the Court dismiss Count 3 of the Information against them, alleging that they abandoned, discarded or otherwise left personal property in a National Wildlife Refuge.

Defendants sincerely hold religious beliefs about the sanctity of human life that compel them to actively provide aid to strangers in need who are likely to die if such aid were not provided; in this case, migrants crossing through the western deserts of Arizona. While exercising their sincerely-held beliefs, Defendants were issued criminal citations by the federal government. Long-established federal law protects their exercise of these beliefs and requires dismissal of the charges against them. Specifically, RFRA and implementing caselaw protect Defendants from being prosecuted for providing humanitarian aid in the Cabeza Prieta National Wildlife Refuge pursuant to these sincerely held moral and spiritual beliefs. Defendants' exercise of their sincere religious beliefs is substantially burdened by the Government's actions, and the Government cannot show that such actions are the least restrictive means of furthering a compelling governmental interest. Therefore, the charges against Defendants should be dismissed. This Motion is supported by the following Memorandum of Points and Authorities. Defendants request an evidentiary hearing on this motion.

. . .

. . .

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. Factual Background

The Government's Information (Dkt. 1) alleges that on August 13, 2017, Ms. Hoffman used a motor vehicle in a wilderness area designated by federal law, the Cabeza Prieta National Wildlife Refuge ("Cabeza Prieta"), without lawful authority in violation of 50 C.F.R. § 35.5.  The information also alleges that, on August 13, 2017, all Defendants were in Cabeza Prieta without a permit in violation of 50 C.F.R. § 26.22(b) and abandoned property in violation of 50 C.F.R. § 27.93.

#### a. *The West Affidavit*

The Government filed an Affidavit (Dkt. 17) ("West Affidavit") from Michael West, a Federal Wildlife Officer of the United States Fish and Wildlife Service.  The West Affidavit alleges Ofc. West received information of individuals in an area of Cabeza Prieta called Charlie Bell Pass/Well.[1]  Ofc. West received photos showing a non-government vehicle being operated in the area.  He received additional photos showing the vehicle driving out of the wilderness area, then driving back into it.  Upon arrival at Charlie Bell Pass, Ofc. West observed a green Ford F150 unattended and legally parked off the roadway.  He recorded the vehicle license plate and observed there was not a valid permit displayed on the dash.  The vehicle was registered to The Unitarian Universalist Church of Tucson.

Ofc. West observed several plastic crates containing individual 1-gallon jugs of water and several wrapped containers of cans of beans in the vehicle.  He then observed a white vehicle parked in the distance past the designated wilderness boundary at the top of Charlie Bell Pass, and fresh tire tracks going towards Charlie Bell Well.

Ofc. West approached Charlie Bell Well and observed "a large stash" of crates containing water and beans matching the items in the green F150.  He drove past Charlie Bell Well and located a white Dodge truck, which was unattended and parked

---

[1] Defendants assume the allegations in the West Affidavit to be true for purposes of this motion only.

off the roadway west of the well.  The vehicle was also registered to The Unitarian Universalist Church of Tucson.  Ofc. West observed there was no permit displayed and the vehicle contained additional jugs of water and cans of beans in the bed of the truck. He failed to locate any persons in the immediate area.

Subsequently, Ofc. West observed four individuals walking out of the desert towards the truck.  He made contact and Defendant Hoffman identified herself as the driver of the vehicle and that they were part of the group No More Deaths.  Ofc. West alleges Defendants told him they did not have permits.  Defendants admitted leaving the "stash" of water and food at Charlie Bell Well.  They said they had left it there to lighten the load of the truck while driving on the rough roads.  They told him they intended to pick it up on their way out.  Defendants told Ofc. West they intentionally did not obtain valid permits.  They did not want to sign a piece of paper which they knew they would not abide by because of their intent to leave humanitarian aid items in the desert.

Ofc. West told Defendants they needed to leave the refuge by the route they took in.  They told him they wanted to drive further west to leave more food and water for people.  He again told them they needed to leave, so they did.  Defendants attempted to collect the water and food left at Charlie Bell Well as they passed by.  Ofc. West told them he would collect the items and transport them off the refuge.

There are no allegations in the West Affidavit that any of the Defendants' actions or conduct negatively impacted any of the flora or fauna in Cabeza Prieta in any way.

### b.  No More Deaths: A Ministry of the Unitarian Universalist Church

Defendants volunteer with the humanitarian aid group No More Deaths.  This organization was founded by various religious leaders in Tucson and embraces faith-based principles; its mission is to "end death and suffering in the Mexico-US borderlands" by upholding fundamental human rights.  *See* "About No More Deaths" http://forms.nomoredeaths.org/about-no-more-deaths/.   (Last visited Sept. 6, 2018.) Since 2008 the organization has been an official ministry of the Unitarian Universalist

Church in Tucson ("UUCT").  Through this ministry, the UUCT has been nationally recognized for its advocacy to end the human rights crisis at the border.

In furtherance and consistent with the religious principles of the Church and individual adherents like Defendants, the No More Deaths mission maintains a year-round humanitarian presence in the deserts of southwestern Arizona.  As one of its principal functions, "[v]olunteers hike the trails and leave water, food, socks, blankets and other supplies [for migrants]."  *See* http://forms.nomoredeaths.org/about-no-more-deaths/. *Id.* The volunteers map out the sites where they leave the water and other supplies; the location of water and food drops correlates to locations and areas where human remains have been documented.  The volunteers then return to the same sites to monitor which of the supplies have been consumed and remove and/or replace the supplies.  They also remove any other trash that might have been deposited in the area. No More Deaths Volunteers adhere to the principle of "taking out more than they leave." *Id.*

The humanitarian crisis addressed by No More Deaths is well-documented as hundreds of migrants die every year from exposure and injury while crossing from Mexico in the southern Arizona desert.  From January 2016 through February 6, 2018, 824 recorded migrant deaths have occurred.   *See* International Organization for Migration, "Migrant Deaths Remain High Despite Sharp Fall in US-Mexico Border Crossings in 2017," Feb. 6, 2018, *available at* https://www.iom.int/news/migrant-deaths-remain-high-despite-sharp-fall-us-mexico-border-crossings-2017   (last   visited August 31, 2018).  This figure only includes known deaths.  Migrant deaths are not always recorded, and government agents and humanitarian groups continue to find unidentified human remains in remote desert areas.

The following map shows that where Defendants were conducting their search and rescue operation on August 13, 2017 is directly within an area where many migrant human remains have been found in the past.[2]



**B.  Relevant Procedural History**

Defendants sought an order compelling the Government to disclose, *inter alia*, discovery relevant to Defendants' defense under RFRA.  (*See* Dkt. 43, Defs.' Mot. to

---

[2] Attached as **Exhibit 1** is an Affidavit from Legal Intern Robert Posey ("Posey Aff.") which provides foundation for the creation of this map.  Mr. Posey used Arizona's OpenGIS Initiative to obtain a map of the remains of Deceased Migrants found in the Cabeza Prieta Wildlife Refuge, which can be found at http://www.humaneborders.info/app/map.asp. (last visited August 31, 2018) Posey Aff. at ¶ 4.  Mr. Posey took a snapshot of this map and then used the Defendants' GPS coordinates as noted in Fish and Wildlife Services Citation (No. 97720) to mark the location of Defendants on the map in comparison to where human remains had been found.  *Id.* at ¶¶ 5-6.

Compel.)  In conjunction with the Motion to Compel, Defendants Holcomb, Huse, and Orozco-McCormick filed a Notice of Declaration in Support of Religious Freedom which provided detail on the beliefs they held which formed the basis of their decision to work with No Mas Muertos.  (*See* Dkts. 55, 57, 61).  The Government moved to strike the declarations.

On June 1, 2018, the Court declined to strike the Defendants' Declarations but denied the Motion to Compel.  (*See* Dkt. 68, 6/01/18 Order.)  The Court's 6/1/18 Order made certain observations regarding the merits of Defendants' RFRA defense.  As discussed below, the Court's observations overlooked some of the pertinent law governing RFRA claims and certain relevant facts of this matter.

## C.  Law and Analysis

In order to ensure broad protection for religious liberty, RFRA provides that the:

> Government shall not substantially burden a person's sincere exercise of religion even if the burden results from a rule of general applicability [unless] it demonstrates that application of the burden to the person: (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

*See* 42 U.S.C. § 2000bb-1(a), (b).  In RFRA, Congress intentionally chose "the most demanding test known to constitutional law" to protect the exercise of religious beliefs.  *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  RFRA extended both the baseline constitutional protections of the Free Exercise Clause and the pre-RFRA statutory limitations on the federal government's ability to burden the constitutionally-protected exercise of religious conscience.  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761-62 (2014).  Under RFRA, the federal government may not "substantially burden" a person's religious exercise, even where the burden results from a religiously neutral, generally applicable law that might be constitutionally valid under *Smith*, unless the imposition of such a burden is the least restrictive means to serve a compelling governmental interest.  *Id.*

Congress amended and strengthened RFRA in 2000 by means of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.* RLUIPA mandates that statutory protections on religious exercise like RFRA "shall be construed in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and by the Constitution."  42 U.S.C. § 2000cc-3(g).

RFRA unquestionably applies to Title 50, Code of Federal Regulation, as it applies "to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."  *Id.* § 2000bb-3(a). RFRA's application is "universal" across all federal law.  *City of Boerne,* 521 U.S. at 516.

RFRA authorizes any "person whose religious exercise has been burdened" in violation of the statute to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief."  The procedural vehicle to move for dismissal is Fed. R. Crim. P. 12(b)(1), which allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." A charge in a complaint may be dismissed if it is subject to a defense that may be decided solely on issues of law.  *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1125 (D. Ariz. 2006).

### a.  The Government Cannot Meet Its Burden to Survive Dismissal Under RFRA.

A RFRA claim requires a court to engage in a burden shifting analysis.  *Gonzales v. O Centro Espiritu Beneficente Uniao de Vegetal* ("*UDV*"), 546 U.S. 418, 428-29 (2006).  The defendant must first demonstrate that the government (1) substantially burdened (2) a sincere (3) exercise of religion.  42 U.S.C. § 2000bb-1(a), (c).  If the defendant satisfies her *prima facie* case, then the burden shifts to the government to demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that government interest." *Id.*

§ 2000bb-1(b).  To "demonstrate" under RFRA means to "meet[] the burden of going forward with the evidence and of persuasion." *Id.* § 2000bb-2(3).

Here, Defendants satisfy their *prima facie* case under prevailing law to show that the Government's action has substantially burdened their "sincere exercise of religion," as that term is defined by RFRA jurisprudence.  The burden therefore shifts to the Government who cannot demonstrate it acted in furtherance of a government interest and that its actions were the least restrictive means of furthering that government interest.  Accordingly, dismissal is warranted pursuant to RFRA.

### i. Defendants Entered Cabeza Prieta to Exercise Their Sincere Religious Belief to Protect and Save Human Life.

RFRA's definition of the "exercise of religion" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* §§ 2000bb-2(4), 2000cc-5(7)(A).  "A determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question."  *Wisconsin v. Yoder,* 406 U.S. 205, 215, (1972).  Religious beliefs often address fundamental questions about life, purpose and death—they often prescribe a particular manner of acting, or way of life, that is "moral or ethical."  *United States v. Meyers,* 95 F.3d 1475, 1483 (10th Cir. 1996).  A moral or ethical belief structure "may create duties often imposed by some higher power, force or spirit—that require the believer to abnegate elemental self-interest."  *Id*.

The question of whether beliefs are religious in nature, for the purposes of RFRA, is a mixed objective and subjective question.  *See Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1144 (11th Cir. 2016).  "*Hobby Lobby* made clear that there is a subjective aspect to this inquiry: courts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action."  The objective inquiry requires courts to consider whether the government actually "puts" the religious adherent to the "choice" of incurring a "serious" penalty or "engag[ing] in conduct that

seriously violates [his] religious beliefs." *Holt v. Hobbs,* ⸺ U.S. ⸺, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015).

Because of the subjective nature of the inquiry into the adherent's beliefs, the "function of the judiciary in determining whether beliefs are to be accorded first amendment protection" is "limited." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984) (reviewing Supreme Court authority); See *also Emp. Div. Dept. of Human Resources of Or. v. Smith,* 494 U.S. 872, 887 (1990), *superseded by statute on other grounds* ("What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith?"); *Eatman v. United Parcel Service,* 194 F.Supp.2d 256, 268 (S.D.N.Y. 2002) ("Courts [are] congenitally incapable of judging the religious nature of an adherent's beliefs based on their content").

The Ninth Circuit has held: "The task is to decide whether the beliefs professed . . . are *in [the person's] own scheme of things,* religious." *United States v. Ward,* 989 F.2d 1015, 1018 (9th Cir. 1992) (emphasis added); *see also Patrick,* 745 F.2d at 157 (the judiciary's "competence extends to determining 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'"). "Religious beliefs . . . are those that stem from person's 'moral, ethical, or religious beliefs about what is right and wrong' and are 'held with the strength of traditional religious convictions.'" *Ward,* 989 F.2d at 1018 (quoting *Welsh v. United States,* 398 U.S. 333, 339 (1970)).[3] This inquiry is understood to be, without qualification, a highly "subjective definition of religion, which examines *an individual's*

---

[3] *Welsh,* like *United States v. Seeger,* was a statutory interpretation case. However, these cases were constitutionally motivated, and the Ninth Circuit is among the courts that have applied them to the constitutional definition of religion. *See Ward,* 989 F.2d at 1018 n.2 ("Courts regularly use the *Welsh* test to determine whether belief is 'religious for First Amendment free exercise purposes.").

*inward attitudes towards a particular belief system*."   *Patrick,* 745 F.2d at 157 (emphasis added).[4]

The defendant must also establish their beliefs are sincerely held.  This element is a question of fact, proven by the credibility of the party asserting a religion-based defense.  *Meyers,* 95 F.3d at 1482. *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007) (stating that sincerity is "a question of fact"); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2nd Cir. 1984) (the sincerity analysis "demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and

---

[4] The belief system in question does not have to be tied to a traditional organized religion.  In *Seeger*, the Supreme Court granted conscientious objector status to someone who objected to war on grounds that were not tied to traditional or organized religion, and that did not involve belief in a supernatural God or a Supreme Being. Instead, he had a profound "ethical belief in intellectual and moral integrity 'without belief in God, except in the remotest sense.'"  *United States v. Seeger*, 380 U.S. 163, 166 (1965).  In *Ward,* the defendant "[did] not describe his beliefs in terms ordinarily used in discussions of theology or cosmology" and "at one point use[d] the term 'atheistic[.]'" 989 F.2d at 1018.  Yet, given the conviction of his beliefs and the risks he was willing to assume to adhere to them, the Court held his beliefs were religious.  *Id.* Here, however, the No More Deaths organization is tied to an organized religion.  It is a ministry of the UUCT and reflects and furthers the religious principles of that religion. Unitarian Universalist Association (UUA) congregations affirm and promote seven Principles, which are held as strong values and moral guides.  "The Principles are not dogma or doctrine, but rather a guide for those of us who choose to join and participate in Unitarian Universalist religious communities."  The Seven Principles are written into the UUA Bylaws.  The First Principle is "the inherent worth and dignity of every person." https://www.uua.org/beliefs/what-we-believe/principles/1st.  The Reflection on the First Principle states: "Reverence and respect for human nature is at the core of the Unitarian Universalist (UU) faith . . . . Unitarian Universalists affirm the inherent worth and dignity of each person as a given of faith—an unshakeable conviction calling us to self-respect and respect for others."  *Id.*  The UU Second Principle is "Justice, Equity and Compassion in human relations."  https://www.uua.org/beliefs/what-we-believe/principles/2nd.  The Reflection on the Second Principle states: "Justice, equity, and compassion in human relations points us toward something beyond inherent worth and dignity.  It points us to the larger community.  It gets at collective responsibility.  It reminds us that treating people as human beings is not simply something we do one-on-one, but something that has systemic implications and can inform our entire cultural way of being."  *Id.*

-10-

cross- examination").  In making this determination, the Court may not decide whether the claimant's belief is true.  *Yellowbear v. Lampert,* 741 F.3d 48, 54 (10th Cir. 2014).  The Court merely must ask whether the claimant is seeking to perpetrate a fraud on the court—whether she actually holds the belief she claims to hold.  *Id.*  The question of "sincerity" is "exceedingly amorphous," *Patrick,* 745 F.2d at 157, and appears to overlap with the test for what is "religious" inasmuch as that test examines the private and subjective (i.e., one's "own scheme of things").  *Seeger,* 380 U.S. at 185.

However, sincerity remains a discrete element in RFRA and Free Exercise analysis.  As distinguished from separating what (in the claimant's scheme of things) is religious from what (in that same scheme) is secular, "[s]incerity analysis seeks to determine an 'adherent's good faith' in the expression of their belief."  *Patrick,* 745 F.2d at 157.  Sincerity analysis "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," and requires a factfinder "to delve into the claimant's most veiled motivations." *Id.*   Because the sincerity of a religious belief is a factual issue, an evidentiary hearing is usually required.  *United States v. Adeyemo*, 624 F. Supp. 2d 1081, 1086-87 (N.D. Cal. 2008).

The Court's 6/01/18 Order observed, without citation to any facts of record, that "Defendants' proclaimed moral, ethical, and spiritual belief to assist humans in need of basic necessities appear to be a simple recitation 'for the purpose of draping religious garb over [political or philosophical activity[.]'" Dkt. 68 at 5:19-21. (citing *United States v. Christie*, 825 F.3d 1048, 1056 (9th Cir. 2016)).  However, the fact that a religious belief or act may overlap with a certain political ideology does not make the belief political rather than religious in nature.

For example, in *Hobby Lobby*, the claimants' opposition to contraceptive coverage mirrored conservative political beliefs about abortion and the Affordable Care Act.  Yet at no time did the Court find that the beliefs of the RFRA claimants were political rather than religious in nature.  Similarity, the religiosity of Defendants' beliefs

should not be questioned merely because they happen to overlap with some secular political views regarding immigration.

More importantly, the Court's observation overlooks the relevant law discussed above that holds Courts are "congenitally incapable of judging the religious nature of an adherents beliefs" based on their content because the inquiry involves "a highly subjective definition of religion," which examines "an individual's inward attitudes towards a particular belief system."[5]  *Eatman,* 194 F. Supp. 2d at 268; *Patrick,* 745 F.2d at 157.  The Court's observation also entirely overlooks significant detail provided in Defendants' sworn declarations wherein each Defendant discuss the basis of their profound spiritual, moral and ethical beliefs in the sanctity of human life.  To each Defendant, <u>in their own scheme of things</u>, these beliefs are held as sincerely as any other religious belief.  It is these beliefs that compelled Defendants to seek to render humanitarian aid on behalf of No More Deaths on the day they were given criminal citations.

Defendant Natalie Hoffman resides in Tucson and is a certified Emergency Medical Technical.  In the past, she has volunteered providing support and care on the Navajo Reservation for housebound elderly residents and at a Holistic Medical Clinic.  Ms. Hoffman has been involved with No More Deaths since June 2014, mostly as a

---

[5] Moreover, *Christie*, the case relied upon by the Court, is distinguishable and is actually inapposite to the Court's observation.  In *Christie*, the Court had to decide whether the Government could prosecute two ministers of the "Hawaii Cannabis Ministry" who admitted to using and distributing large quantities of cannabis, but who claimed that they were exercising their sincerely held religious belief that cannabis was to be celebrated as a sacrament.  825 F.3d at 1052.  The Ninth Circuit observed that the Defendants were required to demonstrate that their "religious beliefs" were not merely a subterfuge to "drape religious garb over commercial activity or straightforward drug trafficking."  *Id.*  at 1056.  The Court noted how "a fair-minded observer might question how plausible each of [the defendants'] assumptions really is[.]"  But, like the trial court, in addressing the defendants' RFRA defense, the Ninth Circuit assumed without deciding that the defendants had satisfied their burden to demonstrate a sincerely held religious belief.  *Id.  Christie* demonstrates just how limited a court's role should be in determining the religious nature of a defendant's particular belief because of the inherently subjective nature of the inquiry.

volunteer but also at one time as a paid Logistics Coordinator.  Ms. Hoffman believes in the church's teachings of "the inherent worth, dignity and equality of every human being" and also believes "we all have an individual and collective responsibility to ease suffering and death where we find it, even in the West Desert of Arizona."  Ms. Hoffman writes:

> I firmly believe I am morally, ethically, and spiritually bound to offer assistance to human beings in need of basic necessities . . . . My spiritual and ethical and moral beliefs compel me to engage in such humanitarian efforts regardless of the personal risks to my own comfort and physical well-being.   These are the beliefs that compelled me, even after suffering severe dehydration to the stage of hospital intervention in the past, to work in the Cabeza Prieta Wilderness on August 13, 2017.

Declaration of Natalie Hoffman, attached as **Exhibit 2.**

**Defendant** Oona Meghan Holcomb is a graduate student at St. Catherine's University, studying Holistic Health and Public Health in Global Health.  She traveled to Tucson to work with No More Deaths; her goal was to provide aid to people at risk of dying in the desert.  Her work with No More Deaths is motivated by her "belief that every person has a right to an existence in which they can live and thrive, regardless of their situation in life."  Ms. Holcomb "firmly believes she is morally, ethically, and spiritually bound to offer assistance to human beings in need of basic necessities."  Declaration of Oona Holcomb, Dkt. 55, Ex. 1.

**Defendant** Madeline Huse learned about No More Deaths while working with the South Texas Human Rights Center, which has a similar mission.  She traveled to Tucson to support No More Death's aim to end death and suffering in the Mexico-US borderlands by providing aid to people dying in the desert.  Her work with No More Deaths is motivated by her belief that "people should have access to basic needs of life, and [she] is obliged as a service to humanity to try to provide these necessities to other human beings in need."  Ms. Huse believes "in the power of good and the greater ideals of love and compassion.  This is in accord with the First Principal of the Unitarian

Universalist Church—that [she] use those gifts given to [her] to offer love, heal injury and support [her] fellow human beings." Declaration of Madeline Huse, Dkt. 57, Ex. 1.

Defendant Zaachila Orozco-McCormick became aware of No More Deaths' humanitarian aid work through online research and personal connections.  She traveled to Tucson from her home state of Washington to volunteer during summer 2017.  She notes:

> I have a strong and abiding moral, ethical and spiritual belief that every person has a right to basic human necessities such as food and water and shelter, regardless of their status, even if that means taking the shirt off my back or the food off my plate . . . My work in support of the No More Deaths Ministry was in furtherance of my moral, ethical and spiritual beliefs.

Declaration of Zaachila Orozco-McCormick, Dkt. 61, Ex. 1.

Based on the detail in the sworn Declarations, there can be no doubt[6] that Defendants were adhering to, what *in their own scheme of things*, amounts to a sincerely-held "religious belief" for purposes of RFRA analysis.[7]  Moreover, binding RFRA precedent provides the Court cannot substitute its own belief structure in determining whether Defendants' beliefs are religious for purposes of RFRA.

Defendants travelled from various parts of the United States to volunteer with No More Deaths.  They did so in the heat of the summer in the brutal southwestern desert.  They committed to the arduous task of hiking in the Sonoran Desert in the middle of summer for one purpose—to render humanitarian aid to help save the lives of migrants who had crossed the border.

---

[6] Indeed, the Defense will be asking the government to stipulate to this aspect of the case in an attempt to streamline the proceedings.  If the Government refuses to stipulate, each Defendant will testify in line with his or her declaration at the evidentiary hearing.

[7] The Defendants' sincere spiritual belief in the inherent worth of every human being and the corresponding duty to provide life-saving care to fellow human beings in distress is a common core-belief in a number of well-known religions including Christianity, Judaism, Mormonism, and Islam.  Every religious tradition has as one of its core tenants the notion that human life possesses a kind of dignity that deserves protection and preservation, including a command to provide aid to persons in the greatest need.

-14-

Defendants did not volunteer for political reasons. Each of the Defendants volunteered with No More Deaths as a matter of a spiritual calling. No More Deaths' humanitarian mission is in furtherance of, and is consistent with, the religious principles of the UUCT and its individual adherents.

Each of the Defendants came to Tucson to help save lives due to their own strong moral or ethical belief system in the sanctity of human life, which is based on deeply-held principles of what is right and wrong. Each of the Defendants were adhering to these sincere and strongly-held principles when they went into Cabeza Prieta on August 13, 2017, to render aid and save lives in the middle of a wilderness that was well-known and documented as an area where many migrants had lost their lives in the past.

### ii. The Government's Prosecution of Defendants Substantially Burdens the Free Exercise of Their Sincerely-Held Religious Beliefs.

To meet their burden under RFRA, Defendants must demonstrate that the Government's actions substantially burdened the free exercise of Defendants' sincere religious beliefs. The Court's 6/01/18 Order observed that "denial of vehicle access by Defendants to portions of the Cabeza Prieta National Wildlife Refuge does not 'affirmatively compel[] [the Defendant], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of [his] religious beliefs.'" Dkt. 68 at 5:5-8 (*citing Wisconsin v. Yoder,* 406 U.S. 205, 218 (1972)). The Court's observation reflects an incomplete and premature analysis of the relevant law.

A substantial burden does not only exist when a person is forced to perform affirmative acts at odd with his/her religious beliefs. The Ninth Circuit has recognized that a substantial burden also exists when an individual is "coerced to act *contrary* to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1069, 1069-70 (9th Cir. 2008) (emphasis added). This substantial burden exists when a person is "coerce[d] . . . into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction." *Snoqualmie Indian Tribe v. F.E.R.C.,* 545 F. 3d 1207, 1214 (9th Cir. 2008); *see also Smith,* 494 U.S. at 898

1    (A State that makes criminal an individual's religiously motivated conduct burdens that

2    individual's free exercise of religion in the severest manner possible, for it "results

3    in the choice to the individual of either abandoning his religious principle or facing

4    criminal prosecution.").

5        A substantial burden exists when a government action either: (1) requires a

6    person to do something her religious beliefs prohibit; (2) prohibits her from doing

7    something her religious beliefs require; or (3) substantially pressure her to modify her

8    religious beliefs or practices—such as by conditioning a significant benefit on violating

9    her religious beliefs.  *Thomas v. Review Bd. of Ind.*, 450 U.S. 707, 717-718 (1981).

10   Indeed, the Department of Justice's own guidance underscores that "[e]xcept in the

11   narrowest circumstances, no one should be forced to choose between living out his or

12   her faith and complying with the law."  Office of the Attorney General, *Federal Law*

13   *Protections for Religious Liberty*, Oct. 6, 2017, at 1.

14       Here, the Government's actions substantially burdened Defendants' ability to

15   exercise their sincerely-held religious beliefs.  The law prohibited Defendants from

16   entering Cabeza Prieta, an area historically known for containing migrants in serious,

17   critical need of aid.  Defendants were also aware that migrant human remains had been

18   found before in the area.  Defendants could not render the aid they were compelled to

19   render without a motor vehicle.

20       Thus, Defendants faced an intractable dilemma.  On the one hand, they could fail

21   to respond to the urgent need to enter Cabeza Prieta to render humanitarian aid.  This

22   failure to respond would risk death or injury to the people needing the aid, a choice that

23   is anathema to Defendants' sincerely-held moral and spiritual principles and belief in

24   the sanctity of human life.  Or, on the other hand, Defendants could face prosecution by

25   the federal government for entering Cabeza Prieta in a vehicle to render humanitarian

26   aid and potentially save lives.  This is precisely the kind of "Catch 22" situation that

27   RFRA's notion of substantial burden was intended to capture.  Under prevailing law,

28

this dilemma and the ensuing prosecution substantially and impermissibly burdened Defendants' exercise of their sincerely held moral and ethical beliefs.

There must be a causal link between the sincere belief and the conduct at issue when a defendant invokes the Free Exercise clause as a defense to criminal prosecution. *See Guam v. Guerrero*, 290 F.3d 1210, 1222-23, (9th Cir. 2002) (defendants had sincerely-held belief in using marijuana but had failed to demonstrate that anything in Rastifarianism required the distribution and importation of marijuana); *United States v. Bauer,* 84 F.3d 1549, 1559 (9th Cir. 1996) (same); *United States v. Manneh*, 645 F. Supp. 2d 98, 108 (E.D.N.Y. 2008). Here, there is a nexus between Defendants' actions and the criminalized conduct.

The Court's 6/01/18 Order observes that Cabeza Prieta only encompasses 13.4% of the total border. (Dkt. 68 at 5:15-17.) The Court apparently relies on this fact to observe that "even if the Court accepts that Defendants attestations are truly religious beliefs, there has been no showing that the exercise of the same has been substantially burdened by the narrowly limited access in the Cabeza Prieta National Wildlife Refuge." *Id.* at 5:22-25.

The Court's observation overlooks the nature of the border wall and the realities of humanitarian crisis in Cabeza Prieta. While Cabeza Prieta may span only a percentage of the entire USA-Mexico border, the Court must consider that the full length of the wildlife refuge has no physical barrier whatsoever to prevent people from crossing into the United States on foot. The government has erected tall metal fences in and around border cities like Nogales, San Diego, and El Paso, or in areas close to major highways in order to deter foot traffic across the border. This has funneled migrant crossers into remote, hostile wilderness areas like Cabeza Prieta, where there is no physical barrier to entry. Cabeza Prieta is an area where people cross into the United States on foot and, as has been well-documented, may die from exposure to the harsh environment.

The No More Deaths mission specifically works in Cabeza Prieta because of the significant and demonstrable loss of life there and the corresponding need for humanitarian aid. The Pima County Office of the Medical Examiner and the Colibri Center for Human Rights and Humane Borders have documented the locations where people die of exposure and dehydration. These findings are publicly documented and accessible by an interactive map which can be found here: http://www.humaneborders.info/app/map.asp (last visited August 31, 2018) It is obvious from this data that death and suffering are rampant in the Cabeza Prieta Wilderness.

Moreover, the Court's observation runs contrary to governing Ninth Circuit law which holds that the Government's action cannot compel a person to act contrary to their religious beliefs. *See Navajo Nation,* 535 F.3d 1058, at 1069-70; *Snoqualmie Indian Tribe,* 545 F. 3d at 1214. Even if there are other areas of the Arizona/Mexico border where Defendant might enter unrestricted (or indeed have entered unrestricted) to render humanitarian aid in exercise of their sincere religious beliefs, the Government may not compel Defendants to choose between acting contrary to their sincerely held belief that they must enter Cabeza Prieta to migrants crossing through that land and criminal prosecution. This would present Defendants with the exact "Catch 22" substantial burden situation that RFRA and implementing courts have made impermissible.

### iii.  It Would Have Been Futile for Defendants to Apply for a Permit.

The Court's 6/01/18 Order observed there "was no denial based on any purported religious belief" because it is "undisputed" that Defendants did not attempt to obtain permits or a special use permit for access to Cabeza Prieta. (Dkt. 68 at 5:2-5.) Once again, the Court's observation fails to consider relevant law on the issue.

In cases where the charges arise from a failure to obtain a permit, a defendant may still make an "as-applied" challenge under RFRA to the permitting system if they

-18-

can demonstrate that applying for a permit would have been futile.  *United States v. Antoine,* 318 F.3d 919, 922 n.4 (9th Cir. 2003); *United States v. Friday,* 525 F. 3d 938, 953 (10th Cir. 2008).  Defendants can demonstrate that applying for permits would have been futile because changes the Government recently made to the permit— in violation of the issuing agency's own rules and regulations—appeared to expressly forbid Defendants from rendering humanitarian aid in Cabeza Prieta in exercise of their religious beliefs.

Defendants had applied for and possessed permits in the past.  Defendant Hoffman had a permit for another area ("the bombing range") in 2015, but was not aware whether that permit also covered Cabeza Prieta.  Defendant Huse had obtained a permit the prior December, but it had expired by the date of the incident.  Defendants Holcomb and Orozco had never obtained or applied for a permit.  However, Defendants' relative status regarding permits is irrelevant because an unlawful change to the plain language of the permits in 2017 appeared to expressly forbid Defendants from rendering the humanitarian aid they went into Cabeza Prieta to dispense.

The permit, which is an annual pass, was amended without following proper agency procedures to require the holder to agree in writing that they are responsible for removing "any and all personal property or possessions that they bring into [the area]." *See* Permit, attached as **Exhibit 3.**  They must also "agree to remove from [the area] all personal property or possessions, including not limited to . . . water bottles, water containers, food, food items, food containers, blankets, clothing, footwear, [and medical supplies][.]" *Id.*  As noted in the West Affidavit (Dkt. 18 at 5:9-10): "To obtain these permits, one must read, complete and sign certifying that they have read the agreement for [Cabeza Prieta and other covered areas]."

Each permit holder must acknowledge an understanding that their permit may be suspended or revoked if they are found to be in violation of these requirements.  Each permit holder also must acknowledge they understand they "may be subject to judicial

penalties to include fines, civil action, and debarment for failure to remove all personal property or possessions from [the area]."

The language prohibiting the leaving of personal property to include water bottles, blankets, medical supplies, etc., was added by the Fish and Wildlife Service to the permit in 2017 without following the proper agency procedures.  This addition made it futile for Defendants to apply for permits because the permit appeared to expressly forbid them from performing the humanitarian aid they wanted to render in Cabeza Prieta in exercise of their sincerely-held religious beliefs.  In other words, in order to obtain a permit, Defendants would have been required to forego their religious mission to render humanitarian aid to migrants.

As noted, one of No More Deaths' central practices is "[v]olunteers hike the trails and leave water, food, socks, blankets and other supplies [for migrants]."  Undertaking this volunteer work is what each of the Defendants was engaged in during Summer 2017, including on August 13, 2017, when they were intending to leave water and other supplies for migrants in the area.

It would have been futile for Defendants to acquire a permit to enter the area if the permit forbade them, under penalty of law, to do precisely what they intended to do when they entered Cabeza Prieta.  The futility of acquiring a permit means Defendants can make an as-applied challenge under RFRA to the laws they are alleged to have violated, even though they might not have possessed permits.

### iv.  Prosecuting Defendants Under C.F.R. Title 50 Does Not Serve a Compelling Government Interest in the Least Restrictive Means.

Because Defendants have satisfied their *prima facie* case, the burden shifts to the Government to demonstrate that the burden upon Defendants' sincerely-held religious belief: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that government interest." 42 U.S.C. § 2000bb-1(b).

RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the law to the specific person whose exercise of

religion is being substantially burdened.  *UDV*, 546 U.S. at 430-31.  A reviewing court must therefore scrutinize the asserted harm of granting specific exemptions to particular religious claimants *Id.*; *accord, Hobby Lobby*, 134 S. Ct. at 2779.  Courts must look to the government's "marginal interest" in enforcing the law in question against the specific individual.  *Hobby Lobby*, 134 S. Ct. at 2779.  This is true even in areas where the government interest is paramount.  *UDV*, 546 U.S. at 431.

A compelling interest for purposes of RFRA is an interest of the highest order.  *UDV,* 546 U.S. at 433, *Yoder,* 406 U.S. 215.  Whether a proffered government interest qualifies as a compelling interest is a question of law.  *Tawahongva*, 456 F. Supp. at 1132.  To show such a particularized interest, the government bears the burden of submitting "additional proof that the *specific* RFRA claimants' *particular* activities" would result in a compelling interest being "meaningfully compromised." *United States v. Christie*, 825 F.3d 1048, 1057 (9th Cir. 2016) (emphasis added).  This is an "onerous burden." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1262 (D.N.M. 2002), aff'd 389 F.3d 973 (10th Cir. 2004) (en banc), aff'd and remanded, *UDV*, 546 U.S. 418.

It is well-established that assertions of a generalized government interest are insufficient to satisfy this analysis.  *See UDV*, 546 U.S. at 430 (government's asserted interest in uniform enforcement of Controlled Substances Act insufficient to justify prosecution of religious organization for its member's use of Schedule 1 hallucinogen in their religious rituals).   The Court must look beyond broadly formulated interests justifying the general applicability of government mandates to scrutinize the asserted <u>individual</u> harm.  *Id.* at 420 (emphasis added).

**1.  Prosecuting Defendants Under CFR Title 50 For Entering Cabeza Prieta To Render Humanitarian Age Does Not Serve Any Compelling Government Interest**

Defendants have been prosecuted under Section 16 of the United States Code and Title 50 of the Code of Federal Regulations.  In analyzing a regulation, the court starts with the language of the regulation but also looks to the context and purpose of the

regulation.  *United States v. Banks*, 514 F.3d 959 (9th Cir. 2008); *United States v. Hughes*, 292 F.3d 1228, 1231 (9th Cir. 2002).  Cabeza Prieta is part of the National Wildlife Refuge System ("System").  *See* West Affidavit (Dkt. 17) at 6:25-27.  Congress designated the Secretary of the Interior to administer the System and issue regulations to manage it.  *See* 16 U.S.C. § 460k-3; § 668dd(a)(1).

A mission of the System is to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans," *id.* § 668dd(a)(4)(B), to "plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System, to contribute to the conservation of the ecosystem of the United States," *id.* § 688dd(a)(4)(C), and ensure the mission and purposes of the System are carried out, *id.* § 668dd(a)(4)(D).  Additionally, Congress has provided that no person shall disturb or injure any property, including natural growth, in the System or "enter, use or otherwise occupy any such area for any purpose . . .  unless such activities are permitted either under subsection (d) [which provides for permits] or by express provision of the law[.]" *Id.* § 668dd(c).

50 C.F.R. § 35.5 provides: "except as specifically provided and subject to existing private rights, there shall be . . . no use of motor vehicles [within the System.]"  50 C.F.R. § 26.22(b) provides "a permit shall be required for any person entering under a national wildlife refuge, unless otherwise provided under the provisions of subchapter C [of Title 50, Chapter I]."  As noted by the Ninth Circuit, there is little doubt that the overarching purpose of [Section 16, U.S.C. and Title 50, C.F.R.] is the conservation, management, and restoration of wildlife and natural habitats.  *United States v. Millis*, 621 F.3d 914, 917 (9th Cir. 2010).

Defendants do not dispute that Section 16 of the United States Code and Title 50 of the CFR promote an important interest.  However, that interest is not served by Defendants' prosecution.  Under RFRA, the Government must show that prosecuting Defendants under the specific circumstances of this case serves the interests of "the

conservation, management, and restoration of wildlife and natural habitats."  In other words, the Government must show the interests of the National Wildlife Preservation System were "meaningfully compromised" when these four Defendants travelled without permits by motor vehicle through Cabeza Prieta on a pre-established road to leave food and water for migrants in need.  *See Christie*, 825 F.3d at 1057.  The Government cannot meet that burden here.  There is no evidence that this occurred.  There is no evidence that Defendants' conduct negatively impacted the conservation, management, and restoration of wildlife and natural habitats.

Although Ofc. West observed that Defendants had left food and water at Charlie Bell Well, Defendants told him they had left the items there only temporarily to ease the weight in their truck and were intending on collecting the items on their way out. Indeed, Defendants attempted to collect the items on the way out of Cabeza Prieta, but Ofc. West prevented them from doing so.[8]  Even if the items had been left there for some period of time, there is no evidence that this would have affected the flora or fauna of the Wilderness Area.  Besides, as discussed, No More Deaths volunteers always return to areas where they left food and water to remove anything previously left there.  No More Deaths Volunteers adhere to the principle of "taking out more than they leave."  *See* http://forms.nomoredeaths.org/about-no-more-deaths/.

### v.   Other Less Restrictive Means Exist Which Would Still Promote the Government's Interest While Leaving Defendants' Free From Prosecution

The least-restrictive-means standard is "exceptionally demanding."  *Hobby Lobby*, 134 S. Ct. at 2780.  "[T]he government must show that [its] objectives cannot be advanced through use of a regulation that is less intrusive of the [the defendant's] religious practices, and that refusing his exemption is, therefore, the least restrictive

---

[8] Although not specifically within the scope of this motion, the Government has another issue with the Abandonment of Property charge. Leaving items temporarily at Charlie Bell Well does not rise to the level of "abandoning" them. *See* https://www.merriam-webster.com/dictionary/abandon (defining "abandon" as "to give up with the intent of never again claiming a right or interest in").

means of [serving the Government's compelling interest]." *Tawahongva*, 456 F. Supp. 2d at 1135. The Ninth Circuit has held the Government can meet its burden of showing a system is the least restrictive means if "it demonstrates that it actually considered and rejected the efficacy of least restrictive means before adopting the challenged practices." *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir. 2005) (reaching conclusion under RLUIPA).

The Court must examine whether the Government's compelling interest could still be safeguarded if a religious exemption for the adherent at question were allowed. *United States v. Adeyemo*, 624 F. Supp. 2d 1081, 1091 (N.D. Cal. 2008). The Government must show that granting a religious exemption to the defendant would result in the compromised ability of the Government to safeguard the compelling interest at issue. *Compare id.* (Government showed that granting religious exemption to law which criminalizing transport, possession, or import of leopard skins would result in compromised ability of the Government to safeguard conservation and survival of endangered leopards), *with UDV,* 546 U.S. at 439 (Government failed to demonstrate how granting religious exemption so sect could use a tea using hallucinogen in religious ceremonies would seriously compromise Government's ability to enforce Controlled Substance Act). The government is not allowed to make a "slippery-slope" argument and speculate that granting an exemption to certain Defendants would lead to other possible RFRA claims. *UDV,* 546 at 435-36; *Christie*, 825 F.3d at 1060-61.

Here, then, the Government must show that it could not have granted these four Defendants an exemption to the permit requirement and the "no vehicles" requirement (or an exemption from prosecution) to allow Defendants to enter Cabeza Prieta to render humanitarian aid without that specific exemption "meaningfully compromising" the Government's interest in conserving, managing, and restoring of wildlife and natural habitats. The Government cannot meet this showing under the facts of this case.

There have been no allegations or evidence that these four Defendants' actions harmed any wildlife or habitat or interfered with conservation, management, or

restoration of any plant, animal, or habitat.  Neither the West Affidavit, the Information, nor any other Government filing in this matter, contain any allegations that Defendants' actions on August 13, 2017, impacted the conservation, management, and restoration of wildlife and natural habitats, which are the goals of the statutes and regulations Defendants have been cited under.  Defendants, like all No More Death volunteers, used roads already in existence and used by others so they were not creating new roads.   As of 2008, Cabeza Prieta Refuge contained almost 8,000 miles of roads, most of them attributable to the activities of federal agents. *See* U.S. Dep't of Interior, *Vehicle Trails Associated with Illegal Border Activities on Cabeza Prieta National Wildlife Refuge* (July 2011), at 2, attached as **Exhibit 4**.

Moreover, leaving water and/or food, either temporarily for the short period of time demonstrated here, or for some longer period of time, would not have any environmental impact.  No More Deaths' volunteers customarily return to the locations where they drop off water and supplies to remove them, thus ensuring no environmental impact from their humanitarian activities.  Likewise, volunteers also remove trash each time they are in the desert.

Because these four Defendants' activities in Cabeza Prieta did not have any negative impact on the flora or fauna there, there is no reason why the Government could not have given these Defendants an exemption to render aid in the area.  Such an exemption would not impact the compelling interest served by Title 50.  Accordingly, under prevailing RFRA law, the Government cannot meet "the least restrictive means" tests and fails to meet its burden.

## CONCLUSION

RFRA protects Defendants from being prosecuted for providing humanitarian aid pursuant to their sincerely held moral, ethical and spiritual beliefs.  Therefore, the charges against them should be dismissed.

RESPECTFULLY SUBMITTED this 10th day of September, 2018.

MITCHELL | STEIN | CAREY | CHAPMAN, PC

By:    /s/ Anne M. Chapman
                                                                    
Anne M. Chapman
Attorneys for Defendants


**CERTIFICATE OF SERVICE**

I certify that on September 10, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Ste. 4800
Tucson, AZ  85701
Attorneys for Plaintiff


       /s/  Julie Greenwood